In re NANTAHALA VILLAGE, INCOR-PORATED, a North Carolina Corporation, Debtor.

NANTAHALA VILLAGE, INCORPORATED, a North Carolina Corporation, Plaintiff–Appellant,

v.

NCNB NATIONAL BANK OF FLORIDA, a National Banking Association, Defendant–Appellee.

and

Fred H. Moody, Jr., Trustee, Defendant.

No. 91–2057.

United States Court of Appeals, Fourth Circuit.

Argued June 1, 1992.

Decided Oct. 2, 1992.

---

Daniel Sears Dearing, Tallahassee, Fla., argued, for plaintiff-appellant.

Peter J. Covington, Smith, Helms, Mulliss & Moore, Charlotte, N.C., argued (Robert H. Pryor, on brief), for defendant-appellee.

Before SPROUSE and HAMILTON, Circuit Judges, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

SPROUSE, Circuit Judge:

In the underlying action, which involved a dispute over loan transactions, Nantahala Village, Inc. ("Nantahala") demanded compensatory and punitive damages [1] from NCNB National Bank of Florida [2] ("NCNB") for alleged (1) breach of a contract to lend money, (2) breach of the common-law duty of good faith, (3) breach of the duty of good faith imposed by the Uniform Commercial Code, (4) unfair and deceptive business practices, and (5) fraud. After referral of the case from the district court to the bankruptcy court, the bankruptcy court made proposed findings of fact and conclusions of law and recom-

---

1. Nantahala also raises an injunction claim, which the district court correctly dismissed as moot. On October 19, 1990, the bankruptcy court entered a final order directing the property to be sold. Because Nantahala did not appeal the order, it became final and nonappealable, and the property was sold.

2. NCNB National Bank of Florida is owned by NCNB Corporation, a holding company operating in several southeastern states with its principal place of business in Charlotte, North Carolina.

mended summary judgment in favor of the defendant NCNB on each count. The district court adopted the bankruptcy court's proposed findings and conclusions, and granted summary judgment to NCNB. Nantahala appeals, and we affirm.

## I

Nantahala is a North Carolina corporation that owns and operates a resort in western North Carolina. Robert Riedel, a Florida resident, is the president and principal shareholder of Nantahala. In 1986, Nantahala approached NCNB to obtain a loan to renovate the property and to refinance a preceding debt. In August 1986, the parties agreed to a $1.4 million loan to be paid over fifteen years. In return, NCNB received a deed of trust on the resort and a security interest in certain personal property located at the resort. Riedel and his wife personally agreed to guarantee payment of the debt to NCNB. The promissory note, the deed of trust, the security agreement, and the loan guaranty agreement were all executed in Florida.

Before 1986 Riedel had made several loans to Nantahala for its off-season operating expenses. In this connection, he had obtained short-term financing from NCNB. In 1987 Riedel personally obtained a $175,000 line of credit from NCNB to provide for Nantahala's off-season needs. This was secured by 9,000 shares of Riedel's NCNB stock, worth $468,000. The documents were also executed in Florida.

In August 1988, because Nantahala was having difficulty meeting its obligation, the parties modified the terms of the promissory note. A new promissory note was executed for $1.2 million, and NCNB again received a deed of trust on the resort and a security interest in Nantahala's personal property. Nantahala was to continue to make monthly interest payments to NCNB, but was to pay the entire principal on demand or by August 1, 1989. The Continu-

ing and Unconditional Guaranty executed by Riedel contained a "dragnet clause" giving NCNB "a lien upon, security title to and a security interest in all property of [Riedel] now or at any time hereafter in the possession of Bank in any capacity whatsoever."

In March 1989, when Riedel's outstanding debt under his line of credit was already at the $175,000 ceiling, Riedel requested an advance above the ceiling. NCNB refused. Nantahala failed to make the March and April 1989 payments due under the terms of the modified loan. In June 1989 Riedel again requested an advance above his line of credit to pay his mortgage interest payments and to meet other Nantahala capital requirements. NCNB refused, sold Riedel's NCNB stock to satisfy the existing line-of-credit obligations, and placed the balance of the proceeds remaining after satisfaction of Riedel's obligations in a collateral account as additional security on Nantahala's loan.

In July 1989 Nantahala requested another modification of the loan, and the parties entered into negotiations. Negotiations broke down, however, and NCNB instituted foreclosure proceedings against Nantahala in superior court in Swain County, North Carolina. On March 18, 1990, the superior court entered an order allowing the trustee to foreclose on Nantahala's property. Nantahala then brought this action against NCNB on April 6, 1990, also in Swain County Superior Court. NCNB removed the action to the United States District Court for the Western District of North Carolina, based on diversity jurisdiction. On June 29, 1990, after the district court ordered that the property be sold, Nantahala filed a petition in the United States Bankruptcy Court for the Western District of North Carolina for reorganization under Chapter 11 of the Bankruptcy Act.[3] On August 29, 1990, NCNB "removed"[4] the

---

3. 11 U.S.C. § 301 *et seq.*

4. We shall assume that the matter before the district court was a referral rather than a removal since the parties, the bankruptcy court, and the district court treated it as such. *See* 28

U.S.C. § 1452 (providing for "removal" of bankruptcy-related civil actions from state courts to federal district courts)—included in the Bankruptcy Amendments and Federal Judgeship Act of 1984, *replacing* 28 U.S.C. § 1478 (which had provided for "removal" of bankruptcy-related

district court action to the bankruptcy court as an adversary proceeding, under 28 U.S.C. § 1452 and Bankruptcy Rule 9027.

The bankruptcy court lifted the automatic stay, allowing this case to go forward. (In the meantime, it ordered Nantahala's property to be sold.) NCNB moved for summary judgment and Nantahala did not respond to or oppose NCNB's motion, failing to submit responsive affidavits or briefs. On February 6, 1991, the bankruptcy court entered proposed findings of fact and conclusions of law and recommended that the district court grant NCNB's motion for summary judgment. Nantahala did not object to the proposed findings and conclusions. On March 4, 1991, the district court adopted the bankruptcy court's recommendation and granted NCNB's motion for summary judgment. Nantahala brings this appeal.

## II

We are initially presented with NCNB's argument that Nantahala, by not objecting to the bankruptcy court's recommendations, waived its right to appeal the district court's resolution of those issues. Bankruptcy Rule 9033 provides:

(a) In non-core proceedings heard pursuant to 28 U.S.C. § 157(c)(1), the bankruptcy judge shall file proposed findings of fact and conclusions of law. The clerk shall serve forthwith copies on all parties by mail....

(b) Within 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific pro-

posed findings or conclusions objected to and state the grounds for such objection....

Bankr.R. 9033, 11 U.S.C. We have not previously considered whether failing to file written objections within the ten-day period deprives the losing party of its right to appeal from the district court's holding on the proposed findings of fact and conclusions of law. However, in *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984), we interpreted a similar provision of the Federal Magistrates Act.[5] The Magistrates Act provides in part:

(B) [A] judge may ... designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any [of several motions, including a motion for summary judgment]....

(C) [T]he magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court....

28 U.S.C. § 636(b)(1).[6]

In *Schronce* we held that this ten-day written-objections requirement provided by section 636(b)(1) is mandatory. *Schronce*, 727 F.2d at 94. The language of Bankrupt-

civil actions from state courts and federal district courts to bankruptcy courts)—included in the Bankruptcy Reform Act of 1978 and repealed in 1984; *Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 658 n. 1 (4th Cir.1985); S. Elizabeth Gibson, *Removal of Claims Related to Bankruptcy Cases: What Is a "Claim or Cause of Action"?*, 34 UCLA L.Rev. 1, 18–19 nn. 73–74 (1986).

**5.** 28 U.S.C. §§ 631–639.

**6.** Rule 72(b) of the Federal Rules of Civil Procedure, which implements the section 636(b)(1) procedures, provides:

A party objecting to the recommended disposition of the [dispositive pre-trial] matter shall promptly arrange for the transcription of the record, or portions of it as all parties may agree upon or the magistrate deems sufficient, unless the district court otherwise directs. Within 10 days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations.... Fed.R.Civ.P. 72(b).

cy Rule 9033(b) is nearly identical to that of Federal Rule of Civil Procedure 72(b). Indeed, the drafters of Rule 9033(b) indicated that the rule "is derived from Rule 72(b) F.R.Civ.P. which governs objections to a recommended disposition by a magistrate." Bankr.R. 9033(b) advisory committee notes.

In interpreting the ten-day written-objections portion of section 636(b)(1) as mandatory, *Schronce* interpreted a statutory enactment of Congress. Bankruptcy Rule 9033, of course, found its place in the scheme of judicial enforcement through the rulemaking process with the ultimate approval of Congress. We see no real interpretative problem presented by this legislative nuance, however. Both Rule 9033(b) and the Magistrates Act are the result of efforts to facilitate the judicial work of the district court by providing for preliminary consideration and recommended resolution by judicial tribunals within the district court family. In our view, the rationale for the procedures are tellingly similar. The drafters' note to Rule 9033, as well as common sense, counsel that a bankruptcy court's proposed resolution should be given the same effect as a magistrate's proposed resolution as far as an adversely affected party's responsibilities are concerned. *See* 1 *Collier on Bankruptcy* 3–55 (Lawrence P. King ed., 15th ed. 1988). Assistance to a district court by a bankruptcy court not only lessens the burden on a district court's docket but also reduces the time required to process controversies within the bankruptcy court. This implicates the same basic underlying purpose identified in *Schronce*—the expedition of judicial business by diversifying the judicial workload. In *Schronce*, we said:

> We do not believe … that the Act can be interpreted to permit a party, such as Schronce, to ignore his right to file objections with the district court without imperiling his right to raise the objections in the circuit court of appeals. The Act's purpose and the framework Congress established to achieve that purpose would be defeated by such an interpretation. Litigants would have no incentive to make objections at the trial level; in fact

they might even be encouraged to bypass the district court entirely, even though Congress has lodged the primary responsibility for supervision of federal magistrates' functions with that judicial body. Equally as troubling, the interpretation of § 636(b)(1) Schronce urges would impose a serious incongruity on the district court's decisionmaking process—vesting it with the duty to decide issues based on the magistrate's findings but depriving it of the opportunity to correct those findings when the litigant has identified a possible error. The same rationale that prevents a party from raising an issue before a circuit court of appeals that was not raised before the district court applies here.

*Schronce*, 727 F.2d at 93–94.

██ We think the same rationale applies here. It would make little sense to allow referral of non-core issues to a bankruptcy court for its initial consideration and then to allow litigants to ignore the recommendation to the district court. The rule requires written objections to the bankruptcy court's recommendations to be filed within ten days, and judicial prudence counsels that the district court's efforts not be wasted by requiring it to start from scratch as if there had been no referral. In our view, Nantahala, by not objecting to any part of the bankruptcy court's recommendation, has waived its rights to present in this court consequent issues which it did not contest in the district court.

### III

Moreover, even assuming Nantahala had properly preserved its appeal, we are of the view that there is no merit to its substantive arguments.

### A

██ Contrary to Nantahala's argument, the district court correctly ruled that the controversy was controlled by Florida rather than North Carolina law. A federal court sitting in diversity must apply the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487,

496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The district court correctly turned to the North Carolina Commercial Code,[7] which gives contracting parties the power to choose applicable law. It states:

> [W]hen a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties.

N.C.Gen.Stat. § 25–1–105(1). The parties have done precisely what section 25–1–105(1) requires. They executed loan documents providing that the documents would be construed according to Florida law, and the loan transactions were reasonably related to the state of Florida. Although Nantahala now argues that this provision was included by "fine print" language on the back of one of the documents and that the bank was the dominant party able to dictate the terms of the agreement, we see nothing in the transactions indicating that kind of control. Nantahala was a sophisticated commercial enterprise; its principal stockholder and chief executive was a sophisticated businessman. Borrowing money from a bank in and of itself is no indication that the borrower is under any kind of coercion or economic necessity to accept the terms imposed by a lender, and there is nothing here to indicate that the negotiations between the parties involved anything more than a straightforward commercial transaction.

Even absent the choice-of-law clause in the documents, Nantahala's argument that North Carolina law applies has little merit. Under the North Carolina Commercial Code's choice-of-law provision, when parties have not agreed that a certain state's law will govern potential disputes, the North Carolina Commercial Code applies if

the transaction "bear[s] an appropriate relation to [North Carolina]." N.C.Gen.Stat. § 25–1–105(1). The North Carolina Supreme Court has interpreted the term "appropriate relation" to mean "most significant relationship." *Boudreau v. Baughman,* 322 N.C. 331, 368 S.E.2d 849, 855 (1988). Nantahala's and Riedel's loan transactions with NCNB were most significantly related to the state of Florida, not North Carolina. Riedel was a Florida resident, NCNB was a Florida corporation, the loan was negotiated in Florida, the loan documents were executed in Florida, and the loan was to be repaid in Florida.

**B**

■ Considering the controversy under Florida law, the district court, citing *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.,* 302 So.2d 404, 408 (Fla. 1974), held that NCNB was entitled to summary judgment on the breach-of-contract claim because there was no agreement on the essential terms, and because Nantahala failed to comply with the preconditions of NCNB's agreement to renegotiate. We agree.

■ Nantahala's next claim alleged a breach of the common-law duty of good faith. In support of this charge, it argued that NCNB misused its superior bargaining position and engaged in unfair dealing during the loan negotiations, and held Riedel's stock in bad faith as excess collateral. Riedel made the same allegations in a personal lawsuit that he filed separately in Florida, and the Florida District Court of Appeal held that the allegations did not state a cause of action. *See Riedel v. NCNB Nat'l Bank of Fla.,* 591 So.2d 1038, 1039–41 (Fla. Dist.Ct.App.1991). We think the district court's decision to grant NCNB summary judgment on this count was also a correct one. Nantahala alleged a breach of the

---

7. The North Carolina Commercial Code applies insofar as the part of the loan secured by Nantahala's personal property and covered by a signed security agreement is an Article 9 secured transaction, and insofar as the promissory notes are Article 3 negotiable instruments.

   Even if the state's Commercial Code did not entirely control the choice-of-law issue, North Carolina common law dictates that the law of Florida applies in this case. Under North Car-

olina common law, the rule of *lex loci contractus* controls. *See Terry v. Pullman Trailmobile,* 92 N.C.App. 687, 376 S.E.2d 47, 49–50 (1989); *Tanglewood Land Co. v. Wood,* 40 N.C.App. 133, 252 S.E.2d 546, 550 (1979). That rule focuses on the state where the contract was entered into or the state where the contract was to be performed. In either case, Florida law governs this dispute.

statutory duty of good faith, imposed by section 25–1–203 of the North Carolina Commercial Code. Although the Florida Commercial Code contains an identical provision, *see* Fla.Stat.Ann. § 671.203, the alleged facts do not establish a breach of that section. The district court found that all of the conduct of which Nantahala complains flowed from valid and binding loan documents executed by both parties. The court, citing *Flagship Nat'l Bank v. Gray Distrib. Sys.*, 485 So.2d 1336, 1340 (Fla. Dist.Ct.App.), *review denied*, 497 So.2d 1217 (Fla.1986), held correctly that a party does not breach section 671.203 when it merely exercises its contractual rights.

■ We also reject Nantahala's argument that NCNB violated North Carolina's Unfair and Deceptive Trade Practices Act. As the district court correctly pointed out, even if North Carolina law were applicable, the exercise of contractual rights is not an unfair trade practice under the North Carolina statute. *United States Dev. Corp. v. Peoples Fed. Savings & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir.1989).

■ Similarly, there is no evidence of any fraudulent misrepresentations made by NCNB to Nantahala. Nantahala alleged that NCNB violated its "duty to advise" Riedel, who signed the Nantahala loan documents without reading them, of certain provisions. Under Florida law, a party who voluntarily executes a document without reading it is bound by its terms. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So.2d 311, 312 (Fla.Dist.Ct. App.1985). Thus, we agree with the district court's decision to grant NCNB summary judgment on this charge.

In short, even absent Nantahala's waiver of its right to present these issues on appeal to this court, we agree with the reasoning of the district court in adopting the recommendations of the bankruptcy court to grant summary judgment to NCNB.

The judgment of the district court is affirmed.

AFFIRMED.